**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

MICHAEL CASTRO,

              Plaintiff,

     v.

STATE OF NEW JERSEY, MICHAEL
MATTIOLI, JAMES RAUCH, BRUCE
DESHIELDS, DARREN DOOLEY, and
MULLICA TOWNSHIP,

             Defendants.

_____

1:15-cv-02041-NLH-JS

**OPINION**

**APPEARANCES:**

DOUGLAS L. CODY
CODY & CODY, ESQS.
653 WHITE HORSE PIKE
HAMMONTON, NJ 08037

MARTIN P. DUFFEY
COZEN AND O'CONNOR
LIBERTY VIEW BLDG.
457 HADDONFIELD RD - SUITE 300
CHERRY HILL, NJ 08002

     _On behalf of Plaintiff_

ROBERT J. MCGUIRE
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
25 MARKET STREET
P.O. BOX 116
TRENTON, NJ 08625

     _On behalf of Defendants State of New Jersey, Michael_
     _Mattioli, James Rauch, Bruce DeShields, and Darren Dooley_

THOMAS B. REYNOLDS
REYNOLDS & HORN, P.C.
750 ROUTE 73 SOUTH -SUITE 202A
MARLTON, NJ 08053

     _On behalf of Defendant Mullica Township_

**HILLMAN**, District Judge

This matter concerns constitutional and state law claims by Plaintiff arising out of his arrests and grand jury indictments for murder and other charges, all of which were ultimately dismissed.  Presently before the Court are Defendants' motions for summary judgment.  For the reasons expressed below, the State Defendants' motion will be denied, and Mullica Township's motion will be granted.

**BACKGROUND**

Plaintiff, Michael Castro, was arrested on April 9, 2013 and indicted by a grand jury on July 3, 2013 for the February 5, 2012 murder of John Kingsbury in Mullica Township, Atlantic County, New Jersey.  On June 30, 2014, the New Jersey Superior Court granted Plaintiff's motion to dismiss the indictment, finding that the Grand Jury did not have "an entirely accurate presentation of the evidence in order to determine whether there was reason to believe that the crimes alleged were committed by [Castro]."  After having been incarcerated for sixteen months, Plaintiff was released from custody on August 8, 2014 because the Atlantic County Prosecutor's Office did not re-indict him within the 45 days afforded by the Superior Court.

On March 20, 2015, Plaintiff filed the instant case against the Atlantic County Prosecutor's Office (ACPO), Mullica Township, and Atlantic County, as well as numerous actors

2

involved in the investigation of the Kingsbury murder, including the ACPO prosecutors, the ACPO investigators, and the Mullica Township police officer who assisted in the ACPO's investigation.  On May 29, 2015, Plaintiff filed an amended complaint, and simultaneously filed a similar complaint in New Jersey Superior Court.

The ACPO Defendants, hereinafter referred to as the State Defendants,[1] removed Plaintiff's state court complaint, which was later consolidated with this case.  The State Defendants and Atlantic County filed motions to dismiss.[2]

While those motions were pending, on January 26, 2016, an Atlantic County Grand Jury again indicted Plaintiff on nine counts, including a count for the first-degree murder of Kingsbury.  Pursuant to a warrant on indictment, Plaintiff was arrested on January 27, 2016.  Plaintiff was released on $250,000 bail.  On March 31, 2016, this Court administratively terminated the case until Plaintiff's criminal case had reached its final resolution.  (Docket No. 53.)

On February 22, 2017, Plaintiff filed a motion to dismiss the second indictment.  A hearing on the motion to dismiss the

---

[1] When county prosecutors perform their law enforcement function, they act as agents of the State.  Wright v. State, 778 A.2d 443, 462 (N.J. 2001).

[2] The motions were ultimately mooted by Plaintiff's filing of a second amended complaint.

indictment was scheduled for May 25, 2017, but in advance of
that hearing, the ACPO moved to dismiss the case on its own
accord.  On May 23, 2017, the Atlantic County Superior Court
entered an Amended Order dismissing the indictment, discharging
the bail, and ordering the release of Plaintiff from custody.

This Court reopened the matter on May 31, 2017.  Plaintiff
filed a second amended complaint on September 11, 2017, while
again simultaneously filing an almost identical complaint in New
Jersey Superior Court.  The State Defendants removed that case,
which was then consolidated with this action.  The Mullica
Township Defendants filed their answer on November 10, 2017, and
the State Defendants and Atlantic County moved to dismiss
Plaintiff's second amended complaint on November 13, 2017.  On
June 25, 2018, the Court granted in part and denied in part the
motions to dismiss.  (Docket No. 99, 100.)

On December 2, 2019, the Mullica Township Defendants and
the State of New Jersey Defendants filed motions for summary
judgment.  On December 4, 2019, the Magistrate Judge granted
Plaintiff's motion for leave to file a third amended complaint.
On December 9, 2019, Plaintiff filed his third amended
complaint, which re-added as a Defendant Joseph Rauch, a
detective for the Atlantic County Prosecutor's Office who had
previously been dismissed as a defendant.  On June 2, 2020,
Rauch filed a motion for summary judgment as to Plaintiff's

4

claims against him in Plaintiff's third amended complaint.[3]

In his 229-page, 1228-paragraph third amended complaint, Plaintiff alleges that Defendants willfully, recklessly, and callously disregarded his rights under federal and state law by blatantly ignoring evidence pointing to other suspects, fabricating evidence and misrepresenting the actual facts adduced through investigation, and failing to obtain and preserve critical evidence, including evidence that likely would have exculpated him and exposed third parties who actually committed or participated in the homicide.  Plaintiff has asserted nine counts for violations of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution, the New Jersey Civil Rights Act, and for the common law torts of false arrest, false imprisonment, malicious prosecution, civil conspiracy, negligence, intentional infliction of emotional distress, and negligent hiring.

All Defendants have moved for summary judgment on various bases.  Plaintiff has opposed Defendants' motions.[4]  In support

---

[3] The Court directed the State Defendants and Mullica Township Defendants to inform the Court as to whether Plaintiff's third amended complaint impacted their pending motions for summary judgment filed relative to Plaintiff's second amended complaint. Those parties agreed that the only substantive difference between the two complaints is the addition of Rauch and allegations directed at him.

[4] Plaintiff agrees that all of his claims against Defendant Police Officer Jake O'Hara, and his claims under 42 U.S.C. §

of their positions, the parties have submitted voluminous briefing and thousands of pages of exhibits.  The State Defendants have succinctly framed the focus of the viability of Plaintiff's claims:  Has Plaintiff demonstrated genuine issues of material fact that his constitutional and state law rights were violated by an arrest and prosecution without probable cause, and with deliberate indifference or malice, or has he merely shown that Defendants could have performed a better investigation, which, even if true, is insufficient to support Plaintiff's claims?

The Court finds that Plaintiff has met his burden to defeat the State Defendants' motion for summary judgment.  However, the Court will grant Mullica Township's motion for summary judgment on a basis different from the underlying substance of Plaintiff's claims against it.

---

1983 against Mullica Township, Mullica Township Department of Public Safety and the Mullica Township Police Department may be dismissed.  Plaintiff opposes Mullica Township's motion with regard to his New Jersey Tort Claims Act claims.  The Court notes that municipal police departments or departments of public safety are not separate entities from the municipalities. Henderson v. Voorhees Tp., 2007 WL 2177354, at *2 (D.N.J. 2007) (citing N.J.S.A. 40A:14-118 (police departments are created as executive and enforcement branches of the municipal government; whether as divisions, departments or agencies of the municipalities)).  Thus, because Mullica Township is considered a single entity with the Mullica Township Department of Public Safety and the Mullica Township Police Department, the Court will refer to these parties as Mullica Township.

## DISCUSSION

### A.    Subject Matter Jurisdiction

This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

### B.    Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."

7

Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

C. **Analysis**

1. *State Defendants' Motion for Summary Judgment*

The State Defendants consist of: Darren Dooley, a member of the ACPO and a captain in the Major Crimes Unit who supervised the investigation of the Kingsbury murder; Bruce DeShields, a member of the ACPO and the chief of the Major Crimes Unit who supervised the investigation of the Kingsbury murder; Michael Mattioli, a member of the ACPO and a sergeant in the Major Crimes Unit who was the lead detective in the investigation of

8

the Kingsbury murder; and Joseph Rauch, a member of the ACPO and a detective assigned to the Major Crimes Unit who assisted in the investigation of the Kingsbury murder.[5]

The assessment of Plaintiff's claims against these Defendants must be broken down into two categories – (1) claims for the violations of Plaintiff's rights under the U.S. Constitution and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), and (2) Plaintiff's other state law claims.

### (1)  Plaintiff's U.S. Constitution and NJCRA violation claims

Plaintiff claims that the State Defendants violated his right to be free from unlawful arrest and detention, false imprisonment, and malicious prosecution without probable cause. Plaintiff claims that these violations were perpetrated by the investigators.  Plaintiff also claims that the investigators' supervisors are liable for failing to properly supervise and train the investigators.

Plaintiff has brought these claims pursuant to 42 U.S.C. § 1983, as well as the NJCRA, which was modeled after § 1983 and is interpreted analogously with § 1983.[6]  Section 1983 provides

---

[5] Defendant Rauch filed a separate motion for summary judgment because the other State Defendants filed their motion prior to Plaintiff re-adding Rauch to his third amended complaint.  The Court will consider his motion in tandem with the other State Defendants' motion for summary judgment.

[6] "By its terms, of course, [§ 1983] creates no substantive

in pertinent part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Constitutional claims may only be asserted against a "person" and not the State.  <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71 (1989) (holding that neither a State nor its officials acting in their official capacities are "persons"

---

rights; it merely provides remedies for deprivations of rights established elsewhere." <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 816 (1985).  Thus, "[t]o establish a claim under 42 U.S.C. § 1983, [a plaintiff] must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." <u>Moore v. Tartler</u>, 986 F.2d 682, 685 (3d Cir. 1993).  Like § 1983, NJCRA is a means of vindicating substantive rights and is not a source of rights itself.  <u>Gormley v. Wood-El</u>, 93 A.3d 344, 358 (N.J. 2014). Because the NJCRA was modeled after § 1983, and creates a private cause of action for violations of civil rights secured under either the United States or New Jersey Constitutions, the NJCRA is interpreted analogously to § 1983.  <u>See</u> <u>Norman v. Haddon Township</u>, 2017 WL 2812876, at *4 (D.N.J. 2017). In contrast to § 1983, which provides remedies for the deprivation of both procedural and substantive rights, N.J.S.A. 10:6-2(c) provides remedies only for the violation of substantive rights.  <u>Tumpson v. Farina</u>, 95 A.3d 210, 225 (N.J. 2014).  Because Plaintiff has alleged substantive violations of his rights, both provisions provide potential vehicles for relief.

under § 1983); Roberts v. New Jersey Turnpike Authority, 2016 WL
6407276, at *5 (N.J. Super. Ct. App. Div. 2016) (citations
omitted) ("We affirm neither the State nor its officials acting
in their official capacities are 'persons' under the [NJCRA].");
Grohs v. Yatauro, 984 F. Supp. 2d 273, 280 (D.N.J. 2013) (citing
Will, 491 U.S. at 65-66) ("The state's sovereign immunity [] is
preserved under Section 1983; a state is therefore not a
"person" who may be sued under Section 1983.").

A state actor may be afforded qualified immunity.
"Qualified immunity shields government officials from civil
damages liability unless the official violated a statutory or
constitutional right that was clearly established at the time of
the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664
(2012). In order to determine whether a government official is
entitled to qualified immunity, two questions are to be asked:
(1) has the plaintiff alleged or shown a violation of a
constitutional right, and (2) is the right at issue "clearly
established" at the time of the defendant's alleged misconduct?
Pearson v. Callahan, 555 U.S. 223, 236 (2009).

"[T]he Third Circuit has held that the general right to be
free from arrest or prosecution absent probable cause was
clearly established by 1994." Dorval v. State, 2021 WL 236625,
at *6 (D.N.J. Jan. 25, 2021) (citing Orsatti v. N.J. State
Police, 71 F.3d 480, 483 (3d Cir. 1995) (arrest); Gallo v. City

11

of Philadelphia, 161 F.3d 217, 220 n.4 (3d Cir. 1998)

(prosecution)).  Depending on the circumstances of the case, the

Third Circuit has also held that the general right to be free

from arrest or prosecution absent probable cause is sufficiently

specific for qualified immunity purposes.  Id. (citing Andrews

v. Scuilli, 853 F.3d 690, 705 (3d Cir. 2017)); see also

Schneider v. Simonini, 749 A.2d 336, 350 (N.J. 2000) ("Based

upon a long line of state and federal cases, we have concluded

that under both the United States and the New Jersey

Constitutions, the law of probable cause was clearly established

by January 1981." (internal citation omitted)).

Thus, in cases such as this one that involve claims for

unlawful arrest, false imprisonment, and malicious prosecution,

the qualified immunity analysis turns on whether the police

officers reasonably but mistakenly concluded that probable cause

existed to arrest, detain, and initiate the criminal

prosecution.  Garlanger v. Verbeke, 223 F. Supp. 2d 596, 608

(D.N.J. 2002) (citing Orsatti, 71 F.3d at 483) (other citations

omitted).  Here, the viability of Plaintiff's claims against the

State Defendants boils down to whether probable cause existed to

arrest Plaintiff for Kingsbury's murder.

In Dempsey v. Bucknell University, 834 F.3d 457, 467–68 (3d

Cir. 2016), The Third Circuit set forth the law governing the

analysis of probable cause in the context of summary judgment:

The Fourth Amendment prohibits police from making an arrest except "upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.  Far from demanding proof of guilt beyond a reasonable doubt, "[p]robable cause exists if there is a 'fair probability' that the person committed the crime at issue." Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) (quoting Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997)).

Put another way, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995).  The probable cause standard thus provides individuals protection "against unreasonable searches and seizures," U.S. Const. amend. IV, while simultaneously enabling investigating officers to act quickly - before necessarily obtaining evidence sufficient to prove guilt beyond a reasonable doubt - to effect an arrest.  "[T]he standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate." Wright v. City of Phila., 409 F.3d 595, 603 (3d Cir. 2005).

As the Supreme Court has observed, "[i]n dealing with

probable cause, . . . as the very name implies, we deal with
probabilities.  These are not technical; they are the factual
and practical considerations of everyday life on which
reasonable and prudent men, not legal technicians, act."
Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting Brinegar v.
United States, 338 U.S. 160, 175 (1949) (alteration in
original)).  For this reason, the Court has eschewed "any rigid
demand that specific 'tests' be satisfied" and has instead
prescribed a "totality-of-the-circumstances approach" to the
probable cause determination.  Id. at 230-31.

That determination is necessarily fact-intensive, and it
will usually be appropriate for a jury to determine whether
probable cause existed.  See Sherwood, 113 F.3d at 401
("Typically, the existence of probable cause in a section 1983
action is a question of fact." (citing Groman v. Twp. of
Manalapan, 47 F.3d 628, 635 (3d Cir. 1995)).  Nevertheless,
summary judgment may be granted on the question of probable
cause if a court concludes that "the evidence, viewed most
favorably to [the nonmoving party], reasonably would not support
a contrary factual finding."  Id.

There is a tension inherent in evaluating probable cause at
the summary judgment stage.  On the one hand, the summary
judgment standard asks whether there is a "genuine dispute as to
any material fact," Fed. R. Civ. P. 56(a), viewing the evidence

"in the light most favorable to the non-moving party," Reedy,

615 F.3d at 210.  On the other hand, the probable cause standard

by definition allows for the existence of conflicting, even

irreconcilable, evidence.  See, e.g., Wright, 409 F.3d at 603.

"[W]e view all [] facts and assess whether any reasonable

jury could conclude that those facts, considered in their

totality in the light most favorable to the nonmoving party, did

not demonstrate a 'fair probability' that a crime occurred," and

"only then would the existence of conflicting evidence rise to

the level of a 'genuine dispute as to any material fact' such

that summary judgment would be inappropriate." Dempsey, 834

F.3d at 468.  The "summary judgment standard must tolerate

conflicting evidence to the extent it is permitted by the

probable cause standard." Id.

In this case, as demonstrated by the more than 1150 fact

allegations in Plaintiff's third amended complaint and the

thousands of pages of evidence presented by the parties'

motions, this case presents the quintessential fact-intensive

assessment of whether probable cause existed to charge Plaintiff

with Kingsbury's murder.  The State Defendants present what they

contend are undisputed facts that lay a solid foundation to meet

the "fair probability" threshold of probable cause, and the

State Defendants argue that Plaintiff's disputes with the

caliber of the murder investigation do not undermine that

probable cause existed to arrest Plaintiff.  In contrast,
Plaintiff argues that the State Defendants' own witnesses refute
the individual "building blocks" upon which the State
Defendants' "Jenga tower of probable cause stands," and that the
State Defendants cherry-pick their "facts," ignoring completely
the totality of circumstances showing that the State Defendants
were anything but objectively reasonable.

Each side has presented a summary of the purported facts
that supports their positions.  The State Defendants contend
that the following facts sufficiently evidence probable cause to
arrest Plaintiff for murdering Kingsbury: (1) Castro knew the
victim (who was the adoptive father of Glenn Kingsbury and who
lived with Glenn); (2) Castro owed money to Glenn; (3)
defendants had evidence that Castro knew that large sums of
money were kept in the victim's home; (4) the person whose gun
was used to kill John Kingsbury, Lauren Kohl, was a friend and
employee of Castro; (5) Kohl had permitted Castro access to her
home (and therefore provided Castro with access to Kohl's gun)
while Kohl was away; (5) witnesses had reported seeing a stocky,
Asian-looking male (which corresponds with Castro's physical
description) near the Kingsbury house on the date of the murder;
(6) witnesses had stated they had seen an unfamiliar "bright"
blue or "metallic" blue or "midnight blue" car in the area near
the Kingsbury house in the period around the murder; (7) at the

time, Castro owned a blue KIA Forte; and (8) Castro was invited to – and turned down – the opportunity to play paintball with Glenn and others on the date of the murder; and (9) Castro called and texted Karen Drew (whom Castro knew was at the Kingsbury home on the date of the murder) numerous times on the date of the murder, and Drew reported to police that she believed the purpose of these repeated communications was to see if she whether she had left the Kingsbury home on the date of the murder.

Plaintiff presents a different set of facts to demonstrate numerous holes in the State Defendants' purported basis for probable cause:[7] (1) falsely characterizing the text messages between Castro and Karen Drew;[8] (2) falsely characterizing the evidence describing the unfamiliar male seen in the neighborhood on the date of the homicide;[9] (3) falsely describing witness

---

[7] In his briefs, Plaintiff details all of these points. The Court annotates only a few to provide examples of disputed issues of material fact sufficient to defeat the State Defendants' summary judgment motion.

[8] In her interview with Rauch, Plaintiff points out that Karen Drew did not say that Castro asked her, in either telephone conversation, when she was leaving Glenn Kingsbury's residence or whether she had left the Kingsbury home.

[9] Plaintiff points out that neighbor Randazzo described the male as having visible "puck marks" on his face. He also said the man had sparse facial hair – a mustache and a "little bit of hair over here [indicating]." The individual who Randazzo indicated parked the blue 4-door vehicle had sparse facial hair and ACPO had possession of Wawa surveillance video showing that

accounts of a vehicle seen in the neighborhood;[10] (4) failing to

conduct any meaningful investigation of third parties; (5)

falsely describing Castro's alleged "access" to the weapon

allegedly used in the homicide and that of others;[11] (6) making

---

Plaintiff was entirely clean shaven on that day. Plaintiff
further points out that Mattioli had told Chris Ricca during his
interview on February 24, 2012 that the neighbors' descriptions
matched Chris Ricca, and not Castro: "You know right now I have
a very detailed description [of] his face structure. You have a
rather unique facial structure. You have a rather pronounced jaw
line. You have pock marks. You have a spotty beard, just like a
16-year-old kid can grow. And when I talked to Castro (and that
information came in prior to us going to talk to Mike), when I
went there and looked at him, I was like, he ain't the guy he's
talking about."

[10] To further elaborate on this point, Plaintiff argues that the
State Defendants' reliance on neighborhood witnesses describing
a blue car in the area on the day of the homicide is without any
merit since (1) Mr. Randazzo said that he noticed that the
unfamiliar male (who had facial hair) parked his car at the end
of the block, (2) Mattioli's principal, undated, 8-page
Investigation Report indicates that the unfamiliar male ". . .
was observed to exit the blue vehicle and walk North on Woodland
Avenue toward Nesco Road," (3) Randazzo, the only neighbor to
describe the number of doors on the vehicle, clearly said he saw
a 4-door car, and Mr. Castro drove a 2-door KIA Forte, (4)
Randazzo believed the vehicle was a Dodge Avenger and said he
was "pretty savvy" when it came to automobiles, (5) Castro's car
had two large stickers on the back window (a Power Athletics
sticker and a Castro Marital Arts sticker) and no witness
reported seeing any such identifying marks.

[11] In contrast to the State Defendants' representation that
Plaintiff was the only one who had access to Lauren Kohl's home
and the guns kept there while she was on vacation, Kohl's co-
worker and daily dog walker both had access. Plaintiff relates
the investigators never asked for their names or followed up
with them. Additionally, during the time Kohl was away, the
rear sliding door had been unlocked. Plaintiff also presents
Kohl's text messages and testimony regarding her inability to
locate her guns or recall where she had left them when she went

false statements to prosecutors about whether Susan Danson was interviewed and withholding her interview and statements from prosecutors and the defense; (7) fabricating evidence by way of filing a false police report regarding Mattioli's alleged contact with a "video company" (that did not exist) in order to cover up and explain his suppression of exculpatory evidence; (8) failing to preserve critical evidence; (9) falsely characterizing location information for Castro's cellular telephone, even after Special Agent Scott D. Eicher, Federal Bureau of Investigation (FBI) Cellular Analysis Survey Team (C.A.S.T.) informed ACPO that Castro's Call Detail Records did not provide any location information between 12:28 p.m. and 2:15 p.m. on the day of the homicide; (10) failing to write timely investigative reports and neglect of duty in the conduct of the investigation; (11) engaging in an undocumented ticket-fixing scheme to confer a benefit on a State witness; (12) failing to provide sufficient facts to support probable cause in obtaining an arrest warrant, and failing to document, in any way, what facts were provided to the issuing judge; (13) failing to investigate and ignoring medical evidence and evidence of the victim's movements on the day of the homicide that would have

---

on vacation, and that she was "going with stolen."

exonerated Castro;[12] (14) conducting the investigation in such a grossly incompetent manner as to demonstrate conclusively a lack of objective reasonableness; (15) willfully ignoring strong evidence of Desmond Walker's culpability for the murder;[13] and (16) willfully tampering with, suppressing, and hiding evidence (victim's cellular telephone) in response to a subpoena served in this civil litigation.

The State Defendants contend that Plaintiff merely seeks recovery because he thinks he can prove that a "better" investigation was possible, but the cogent legal question is not

---

[12] Plaintiff presents medical and electronic evidence which he contends reasonably shows that Kingsbury was alive at 2:07 p.m. and shot minutes before 2:37 p.m., and Plaintiff was in Hammonton during this time, which is 10-15 minute drive from Kingsbury's residence.

[13] Plaintiff provides evidence to show that Kingsbury was shot minutes before 2:37 p.m., when Lauren Kohl's jeep was captured on the Nesco Liquors surveillance video driving away from the crime scene.  A memo by the ACPO relates that Kohl and Desmond Walker had a personal relationship; Walker was unemployed, lived with his mother and sister, had long-standing and ongoing money problems, and did not own a vehicle that operated; Kohl made contradictory statements to Detective Rauch about Walker having been to her residence in Sicklerville, New Jersey; Walker had potential access to the alleged murder weapon by virtue of his relationship with Kohl and as shown through his Call Detail Records; Walker had borrowed Kohl's red-orange Jeep Wrangler for a period of at least several months beginning on the day prior to the homicide; surveillance video shows Kohl's jeep driving toward the crime scene at 1:16 p.m. on the day of the homicide and driving away from the crime scene at 2:37 p.m. and these times accord with weight of the evidence, including the medical evidence, as to when the homicide likely occurred.

whether defendants conducted a "thorough" investigation, a
"good" investigation, a "fair" investigation, or even a "grossly
negligent" investigation with respect to the Kingsbury murder.
Instead, the State Defendants contend, even if they performed a
grossly negligent investigation, Plaintiff has not demonstrated
disputed issues of material fact that negate: (1) the
"significantly lower" evidentiary standard for probable cause
than the standard which is required for conviction, and (2) the
above-outlined facts and circumstances that were within the
State Defendants' knowledge, which were "reasonably trustworthy
information [] sufficient to warrant a prudent man in believing"
that Plaintiff had murdered Kingsbury.  See Wright v. City of
Philadelphia, 409 F.3d 595, 602 (3d. 2005).

    The Court does not agree that Plaintiff's evidence
presented in opposition to the State Defendants' motion only
challenges the skill level of the investigation rather than cast
doubt on the objective reasonableness of facts to support his
arrest.  The Court accepts the proposition that even if an
investigation is, for example, a hypothetical 2 out of 10
performance rating, so long as "the facts and circumstances
within the arresting officer's knowledge are sufficient in
themselves to warrant a reasonable person to believe that an
offense has been or is being committed by the person to be
arrested," Orsatti, 71 F.3d at 483, then probable cause may

still be properly established.  However, when viewed in a light
most favorable to Plaintiff, and if believed by a jury,
Plaintiff has presented evidence showing that the facts and
circumstances were not sufficient, and the foundation for
probable cause was based on intentional or deliberatively
indifferent conduct by the State investigators, such that a
reasonable person would not believe that Plaintiff murdered
Kingsbury.

The question of probable cause is generally one for a jury,
Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998);
Stolinski v. Pennypacker, 772 F. Supp. 2d 626, 638 (D.N.J. 2011)
(noting that probable cause is "a sufficiently fact-laden issue
as to typically be a question for the jury"), but "there are
easy cases where a complaint establishes that the officers
possessed a set of facts, and that set of facts establishes
probable cause as a matter of law," Collick, 2016 WL 6824374 at
*1 (citing Baker v. Wittevrongel, 363 F. App'x 146, 150 (3d Cir.
2010).  The Third Circuit has directed, however, that "Courts
should exercise caution before granting a defendant summary
judgment in a malicious prosecution case when there is a
question of whether there was probable cause for the initiation
of the criminal proceeding because, generally, the existence of
probable cause is a factual issue," and it "certainly is
inappropriate for a court to grant a defendant officer's motion

for summary judgment in a malicious prosecution case if there are underlying factual disputes bearing on the issue or if reasonable minds could differ on whether he had probable cause for the institution of the criminal proceedings based on the information available to him."  Halsey v. Pfeiffer, 750 F.3d 273, 300 (3d Cir. 2014) (internal quotations and citations omitted).

This is not an "easy case."  Plaintiff has presented sufficient evidence to show underlying factual disputes, and to show how reasonable minds could differ on the State Defendants' purported basis for probable cause to arrest Plaintiff for Kingsbury's murder.[14]  On this record, a jury, and not this Court, must resolve these issues.

Similarly, a jury must resolve Plaintiff's claims against the first-line investigators' supervisors, Defendants Bruce DeShields and Darren Dooley.  Defendant Bruce DeShields was a member and employee of ACPO and was, during the time of the relevant events, assigned as a Lieutenant of the Major Crimes Unit, with supervisory responsibility over its investigations and Sergeant Mattioli.  Chief Dooley was a member and employee of ACPO and was, during the time of the events described, assigned as Chief of County Detectives.  Chief Dooley

---

[14] In addition to documentary evidence, Plaintiff relies upon testimony and opinions of several experts.

23

was and remains in command of the Detective Division of the
Atlantic County Prosecutor's Office, with supervisory
responsibility over investigations by the Major Crimes Unit and
Sergeant Mattioli.

Plaintiff claims, with reference to deposition testimony
and expert opinions, that the failure by Dooley to require
Mattioli to write reports and to require DeShields to review
investigative reports or original evidence was a neglect of duty
and demonstrated a reckless indifference to the constitutional
rights of Plaintiff.  Plaintiff contends that DeShields
indicated that his practice was (1) to rely only upon oral
briefings by Mattioli as to the status of the homicide
investigation, and (2) to not require Mattioli to write or
submit investigation reports to him.  Plaintiff further contends
that Dooley failed to prevent or correct these practices
and failed generally in his duty to supervise the detectives
under his command.  Plaintiff claims that these practices
directly led to and caused the arrest, detention, and
prosecutions of Plaintiff.

The supervisor Defendants argue that they are entitled to
summary judgment because (1) they had a very limited role in
overseeing the investigation into Kingsbury's murder, (2) there
is no constitutional right to timely reports or reports of a
specific nature, (3) they cannot be held liable for purported

24

lies contained within the reports, and (4) they cannot be held liable for the investigators' actions on a *respondeat superior* theory.

As for Defendants' first argument, the lack of involvement in the investigation by the investigators' supervisors is precisely the conduct Plaintiff contends violated his constitutional rights.  For Defendants' last argument, Plaintiff is not alleging that the supervisors are liable for the investigators' actions, but rather the supervisors themselves were deliberately indifferent to Plaintiff's constitutional rights, which are viable claims.  See Davis v. Yates, 2020 WL 526129, at *10 n.3 (D.N.J. 2020) (discussing Ashcroft v. Iqbal, 556 U.S. 62, 676 (2009) and Barkes v. First Corr. Med., Inc., 766 F.3d 307, 319 (3d Cir. 2014), rev'd on other grounds, Taylor v. Barkes, 575 U.S. 822 (2015), and noting that a theory of supervisory liability is viable if a plaintiff sufficiently alleges that a defendant had personal involvement in the alleged violation and was at least deliberately indifferent).  As for the other two arguments, Plaintiff does not assert those specific claims.

Consequently, Plaintiff has provided sufficient disputed issues of material fact regarding the investigation overall, which includes evidence to support his claims as to the investigators' supervisors' own alleged failures that led to the

faulty basis for probable cause to arrest Plaintiff for Kingsbury's murder.  A jury must assess whether their actions were deliberately indifferent to Plaintiff.

Finally, the State Defendants argue that Plaintiff has failed to prove their alleged actions proximately caused his constitutional injuries, which is fatal to his constitutional violation claims.  "A § 1983 claim requires that the state actor was the proximate cause of the plaintiff's harm." Johnson v. Provenzano, 646 F. App'x 279, 282 (3d Cir. 2016) (citing Egervary v. Young, 366 F.3d 238, 246 (3d Cir. 2004)).  The State Defendants contend that because probable cause existed for his arrest, any deficiencies in the investigation were not the proximate cause of his arrest.[15]  The Court has already determined that the issue of whether probable cause existed is an issue that a jury must consider.  Consequently, the issue of proximate cause must be submitted to the jury as well.  See Rivas v. City of Passaic, 365 F.3d 181, 193 (3d Cir. 2004)

---

[15] As an example, the State Defendants contend that "an alleged deletion of texts between Glenn and John Kingsbury only caused the charges against Castro if the deleted texts tended to exonerate Castro, a showing that Castro cannot make."  The Court questions how Plaintiff would be able to show how deleted texts exonerated him when their deletion, and Defendants' alleged tampering with and mishandling of John Kingsbury's cell phone, is one of Plaintiff's primary arguments as to Defendants' recklessness in the probable cause determination.  In other words, the deletion of those text messages and the mishandling of Kingsbury's cell phone is the very reason Plaintiff claims he cannot exonerate himself.

(citing Martinez v. California, 444 U.S. 277, 284-85 (1980))

(other citation omitted) (explaining that even though a § 1983

"plaintiff must demonstrate that the defendant's actions were

the proximate cause of the violation of his federally protected

right, the presence of the requisite causation is normally a

question of fact for the jury").

For the forgoing reasons, Plaintiff's constitutional

violation claims may proceed against the State Defendants

because a jury must determine whether probable cause existed to

charge Plaintiff for Kingsbury's murder, whether the

investigators' supervisors were deliberately indifferent in

their supervisory duties over the Kingsbury murder

investigation, and whether the actions of the investigators and

their supervisors proximately caused Plaintiff's constitutional

injuries.[16]

---

[16] The determination of whether an officer acted in an
objectively reasonable manner and is thus entitled to qualified
immunity is a question of law that is properly answered by the
Court.  Although in qualified immunity cases the Court is
especially cognizant of the need for resolution at the earliest
possible stage of litigation, the Court cannot do so until all
the material historical facts are no longer in dispute.  Curley
v. Klem, 499 F.3d 199, 211, 211 n.12 (3d Cir. 2007).  Once a
jury has resolved the issues of probable cause, supervisor
liability, and proximate cause, the Court will determine whether
the State Defendants are entitled to qualified immunity.  See
Phong Duong v. Telford Borough, 186 F. App'x at 216 (3d Cir.
2006) (quoting Curley, 298 F.3d at 278) ("When there is a
disputed question of material fact 'relevant to the immunity
analysis,' granting summary judgment for the defendant on the
basis of qualified immunity 'will be premature.'")).

### (2)  Plaintiff's State Law Claims

In addition to his § 1983 and NJCRA claims, Plaintiff asserts claims against the State Defendants under New Jersey state law for the torts of false arrest, false imprisonment, malicious prosecution, civil conspiracy, negligence, and intentional infliction of emotional distress.  The New Jersey Tort Claims Act (NJTCA), N.J.S.A. 59:1-1 to 12-3, governs tort claims against public employees.  Under the NJTCA, "A public employee is not liable if he acts in good faith in the execution or enforcement of any law.  Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."  N.J.S.A. 59:3-3.  The NJTCA strips a public employee of any immunity, however, if that employee is found to have engaged in "willful misconduct."  N.J.S.A. 59:3-14(a).

Whether these defendants acted in good faith cannot be determined at this time for the same reasons as Plaintiff's constitutional claims.  This is because the same "objective reasonableness" standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. 59:3-3.  See Mantz v. Chain, 239 F. Supp. 2d 486, 507-08 (D.N.J. 2002) (citing Lear v. Township of Piscataway, 566 A.2d 557 (N.J. Super. Ct. App. Div. 1989)).  Furthermore, willful misconduct is "the commission of a

28

forbidden act with actual (not imputed) knowledge that the act is forbidden . . . . [I]t requires much more than an absence of good faith and much more than negligence." PBA Local No. 38 v. Woodbridge Police Dep't, 832 F. Supp. 808, 830 (D.N.J. 1993) (internal quotations omitted)).

Because there exists genuine issues of material fact regarding whether the individual State Defendants engaged in willful misconduct, the Court cannot determine as a matter of law whether the NJTCA shields them from liability for their actions as alleged by Plaintiff.[17]

### 2.   *Mullica Township's Motion for Summary Judgment*

Plaintiff has asserted claims based on New Jersey state law against Mullica Township.[18]  Two Mullica Township police officers, Paul Sarraf and Michael Keeping, who are not named defendants, were the first to respond to Kingsbury's house in response to Glenn Kingsbury's call to 911.  Plaintiff alleges

---

[17] The New Jersey Tort Claims Act expressly provides that the State of New Jersey is liable for the tortious conduct of public officials, which includes any "political subdivision or public body in the State."  N.J.S.A. 59:2-2(a), 59:1-3.  When a county prosecutor's office investigates, arrests, and prosecutes an individual, the office is acting as an "arm of the State," and the State is vicariously liable under the NJTCA for the county prosecutor's office's actions.  Moncalvo v. City of Plainfield, 2016 WL 6662694, at *2 (D.N.J. 2016) (citing Wright v. State, 778 A.2d 443, 461 (N.J. 2001)).

[18] As noted above, Plaintiff has not opposed Mullica Township's motion as to Plaintiff's § 1983 claims against it and Defendant Jake O'Hara.

the events as follows.

On February 5, 2012, John Kingsbury was shot twice in the head while in his home at 2140 Woodland Avenue in Mullica Township, New Jersey.  His son, Glenn Kingsbury, was reportedly the first person to find his father and called 911 at 3:09 p.m. Mullica Township Police Officers Paul Sarraf and Michael Keeping arrived at the scene at 3:14 p.m. and found John Kingsbury lying face up on the floor struggling to breathe with blood around his head and a large amount of bloody vomit on his face.  Officers Sarraf and Keeping failed to recognize that John Kingsbury had bullet entry holes above his right eye and behind his left ear. Officers Sarraf and Keeping failed to recognize that John Kingsbury had stippling, or small dots, on his face which is indicative of being shot in the face at close range.

EMS personnel arrived at 3:22 p.m. and transported John Kingsbury to the hospital at 3:56 p.m.  Despite the fact that his father was seriously injured, Glenn Kingsbury did not accompany his father to the hospital but stayed behind to clean up the blood.  Officers Keeping and Sarraf checked the house for evidence of foul play and reportedly found none and left the scene at 3:58 p.m.  Soon thereafter, Officers Keeping and Sarraf returned to the scene in response to a call by Glenn Kingsbury indicating that he found two bullet casings on the floor.  By that time, Glenn Kingsbury had substantially altered the scene

30

of the crime.  In addition to handling the shell casings, Glenn
Kingsbury and/or Karen Drew had cleaned up the blood from
the floor, manipulated John Kingsbury's cell phone and
manipulated a DVR which may have contained surveillance video
footage of the house at the time of the homicide.  John
Kingsbury's phone was not secured as evidence and went missing
for several years.

Plaintiff has retained Joseph Cipollini as his law
enforcement expert in this matter.  Based on the foregoing
facts, it is Mr. Cipollini's opinion that Mullica Township
Police Officers Keeping and Sarraf were negligent for their
failure to conduct a proper investigation, failure to discover
that John Kingsbury had suffered two gunshots to the head and
failing to secure the crime scene of the John Kingsbury
homicide.  To the extent that the jury determines that the
conduct of Officers Keeping and Sarraf was negligent, then
Mullica Township is liable to Plaintiff pursuant to the doctrine
of *respondeat superior.*

In response, the Mullica Township elaborates on its view of
the events.  Officers Sarraf and Keeping, who arrived at the
scene before Emergency Medical Service personnel, noted that the
victim's son reported that his father had been having COPD and
other medical issues including difficulty walking, and that he
may have fallen and struck his head.  At the scene, Officers

Keeping and Sarraf promptly attended to the victim by attempting to clear his airway of significant amounts of blood, vomit, and dentures, applied a bag valve mask to the victim to assist his breathing, and continued to assist after medical technicians arrived to provide emergency care.

Significantly, the facts are clear that while Officers Keeping and Sarraf were at the scene, engaged in efforts to save Mr. Kingsbury's life, there were no reports, statements made, or information provided to these officers to indicate that Mr. Kingsbury had suffered gunshot wounds or that a crime of any kind had taken place, and the EMS personnel did not make such a determination at the scene.  Indeed, Glenn Kingsbury's 911 call on the afternoon of February 5, 2012, was made to seek medical assistance for his severely ill father, not to report that a crime had occurred.

Mullica Township argues that the officers' actions were not negligent, they are entitled to good faith immunity, N.J.S.A. 59:3-3, and they are also entitled to immunity under New Jersey's Good Samaritan Act, N.J.S.A. 2A:62A-1.1.

Plaintiff bases his claims against Mullica Township on N.J.S.A. 59:2-2, which provides:

> a. A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances.

32

N.J.S.A. 59:2-2(a) - Liability of public entity.

Plaintiff fails to reference subsection (b), which

provides:

    b. A public entity is not liable for an injury resulting
    from an act or omission of a public employee where the
    public employee is not liable.

N.J.S.A. 59:2-2(b).

Subsection (b) is directly relevant here because the public

employees who allegedly acted negligently are Officers Keeping

and Sarraf, and in order to hold Mullica Township liable for

their actions, they must be found liable.  Keeping and Sarraf,

however, are not named defendants in Plaintiff's third amended

complaint.  Without any mechanism to find Keeping and Sarraf

negligent, their employer, Mullica Township, cannot be liable.

Consequently, Mullica Township is entitled to summary judgment

on Plaintiff's claims against it.[19]

---

[19] Plaintiff filed his original complaint on March 20, 2015, and
he filed his fourth iteration on December 9, 2019.  Plaintiff
has not requested leave to amend to add these Mullica Township
police officers to his complaint, and the Court declines to *sua
sponte* grant Plaintiff leave to amend his complaint for the
fifth time to assert state law claims against Keeping and
Sharraf.  See Fletcher-Harlee Corp. v. Pote Concrete
Contractors, Inc., 482 F.3d 247, 252-23 (3d Cir. 2007) (noting
that "we implicitly reject[] any argument that, outside of civil
rights cases, district courts must *sua sponte* grant leave to
amend before dismissing a complaint").

## CONCLUSION

In consideration of the claims the Court dismissed previously[20] (Docket No. 99, 100), and the Court's findings above, Plaintiff's constitutional and state law claims regarding the propriety of the probable cause determination by the investigators (Mattioli and Rauch) and their supervisors (Dooley and DeShields) survive the State Defendants' motion for summary judgment and may proceed to trial. Mullica Township is entitled to summary judgment on all claims asserted against it and will be dismissed from the case.

An appropriate Order will be entered.


Date: February 22, 2021                    s/ Noel L. Hillman
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.


---

[20] At the resolution of the Defendants' motions to dismiss on June 25, 2018, the Court did not require Plaintiff to file an amended complaint to reflect the Court's ruling, as the Court had outlined which claims were dismissed and which claims remained. (Docket No. 99, 100 at 34.) When Plaintiff was granted leave to file his third amended complaint, which was filed on December 9, 2019, Plaintiff, however, failed to remove the claims and allegations that this Court had previously dismissed. This Court's instant Opinion and the accompanying Order again set forth the remaining viable claims.